# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

**PLAINTIFFS UNDER SEAL**

**v.**

**DEFENDANTS UNDER SEAL**

**Civil Action No. _____**

**FILED UNDER SEAL**

**JURY TRIAL DEMANDED**

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729, ET SEQ. AND STATE LAW COUNTERPARTS

Michael Hamilton
TN BPR #010720
PROVOST UMPHREY LAW FIRM, LLP
4205 Hillsboro Pike, Suite 303
Nashville, TN 37215
(615) 297-1932
mhamilton@pulf.com
*Attorney for Plaintiffs/Relators*

*Of Counsel*
W. Scott Simmer
Andrew M. Miller
SIMMER LAW GROUP PLLC
600 New Hampshire Avenue, NW, Suite 10-A
Washington, DC 20037
Telephone: (202) 333-4562

Jeffrey J. Downey
THE LAW OFFICE OF JEFFREY J. DOWNEY,
P.C.
1225 I Street, NW, Suite 600
Washington, D.C. 20005
Telephone: (202) 712-9120

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **UNITED STATES OF AMERICA *ex rel*. JACQUELINE BURDETT AND STEVE APPLETON, and on behalf of the STATES of FLORIDA, GEORGIA, INDIANA, MARYLAND, NORTH CAROLINA, TENNESSEE, TEXAS, and the Commonwealth of VIRGINIA,** | |
| **Plaintiffs,** | **Civil Action No. _____** |
| | **FILED UNDER SEAL** |
| **v.** | **JURY TRIAL DEMANDED** |
| **SIGNATURE HEALTHCARE LLC A/K/A SIGNATURE HEALTHCARE, HEALTH CARE REIT, INC., ARBA GROUP, INC., JOHN DOES #1-50, FICTITIOUS NAMES,** | |
| **Defendants,** | |

Filed Under Seal

ii

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   JURISDICTION AND VENUE ............................................................................ 3

III.  PARTIES ............................................................................................................... 4

    A.   Plaintiffs/Relators .......................................................................................... 4

    B.   Defendants ...................................................................................................... 5

        1.   Signature HealthCARE LLC ............................................................... 5

        2.   ARBA Group, Inc. ............................................................................... 6

        3.   Health Care REIT, Inc. ........................................................................ 6

        4.   John Does #1-50 Fictitious Names ...................................................... 7

IV.   REGULATORY BACKGROUND ....................................................................... 7

    A.   The Medicare Program ................................................................................... 7

        1.   Medicare Part A .................................................................................... 8

        2.   Medicare Part B .................................................................................... 9

        3.   Medicare Reimbursement and SNFs .................................................. 10

    B.   TRICARE ..................................................................................................... 19

    C.   Medicaid ....................................................................................................... 20

V.    DEFENDANTS' FRAUDULENT SCHEME ..................................................... 21

VI.   DEFENDANTS CONSPIRED TO DEFRAUD GOVERNMENT PROGRAMS ............. 33

VII.  DEFENDANTS KNOWINGLY VIOLATED THE FALSE CLAIMS ACT AND FALSELY CERTIFIED COMPLIANCE WITH FEDERAL REGULATIONS ............ 34

COUNT I (Violation of the Federal False Claims Act, 31 U.S.C. § 3729: Presenting or Causing to be Presented False Claims) ................................................................. 36

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729: False Records) .......................... 37

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729: Conspiracy) .............................. 37

COUNT IV (Violation of Florida False Claims Act) ................................................................... 38

COUNT V (Violation of Georgia False Medicaid Claims Act) ................................................... 39

COUNT VI (Violation of Indiana False Claims and Whistleblower Protection Act) .................. 40

COUNT VII (Violation of Maryland False Health Claims Act) .................................................. 41

COUNT VIII (Violation of North Carolina False Claims Act) .................................................... 43

COUNT IX (Violation of Tennessee Medicaid False Claims Act) .............................................. 44

COUNT X (Violation of Texas Medicaid Fraud Prevention Act) ............................................... 45

COUNT XI (Violation of Virginia Fraud Against Taxpayers Act) .............................................. 47

Filed Under Seal

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729 ET SEQ. AND STATE LAW COUNTERPARTS

This is an action brought on behalf of the United States of America and the *Qui Tam* States by Jacqueline Burdett and Steve Appleton, by and through their attorneys, against Defendants, pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* and pursuant to the following State *qui tam* statutes: the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* (2000); the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.* (2007); the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.* (2007); the Maryland False Health Claims Act of 2010, Md. Code Ann., Health-Gen. § 2-601 *et seq.* (LexisNexis 2010); the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.* (2010); the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.* (2006); the TEX. HUM. RES. CODE § 36.001 *et seq.* (2006); and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.* (2011) ("State *qui tam* statutes" or "*Qui Tam* States").

## I.     INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the United States and the *Qui Tam* States, arising from false statements and claims that Defendants knowingly presented to, or caused to be presented to, the United States in violation of the FCA and State *qui tam* statutes.

2.     From at least 2007 to the present, Defendants orchestrated a corporate-wide practice and policy of fraudulently maximizing billing for Medicare Parts A and B, TRICARE, and Medicaid (collectively "Government Programs) in the provision of skilled therapy and related services.  Defendants provided staffing, policies, procedures and controlled the billing

practices of their individual skilled nursing facilities ("SNFs") throughout the United States, as more fully described herein.

3. Defendants individually, collectively and institutionally developed a corporate business model in which they systematically overbilled Resource Utilization Groups ("RUGs") under Medicare and TRICARE through their skilled therapy programs, including, but not limited to physical, occupational and speech therapies. Defendants maximized the number of days it billed to Medicare and TRICARE at the Ultra High level by setting aggressive Ultra High-related targets that were completely unrelated to its patients' actual conditions, diagnoses, or needs.

4. Defendants created various incentives to overbill Government Programs at a corporate-wide level. For lower level employees, Defendants implemented productivity and pre-assigned therapy minutes to artificially inflate patient RUG levels beyond their appropriate therapeutic level. And to ensure that its employees carried out its unlawful scheme, Defendants devised a series of "benchmarks" that each facility was required to meet or exceed. For example, the corporate-wide benchmark established for Ultra High and Very High RUG levels exceeded 90%, which means that Defendants sought to (and did) place more than 90% of all therapy patients into Ultra High and Very High RUG categories, leaving less than 10% of all patients to be placed into the remaining High, Medium, and Low RUG reimbursement levels. Defendants developed these benchmarks based on corporate revenue goals that intentionally ignored the therapy needs of their individual patients for the express purpose of maximizing revenues obtained from Government Programs.

5. To further its corporate-wide scheme, Defendants directed Rehab Managers to monitor and control the amount of therapy that each patient would receive. Rehab Managers used corporate forms to carefully track the RUGs and every therapist's productivity levels. And

Defendants' Rehab Managers carried out these directives, including by purposely pre-assigning therapy minutes to meet Defendants' financial goals without regard to the patient's actual clinical condition. This unlawful conduct included forcing therapy on patients who were near death or dying and who would have been better served with palliative or hospice care.

6.      Defendants' corporate strategy and pressure succeeded in significantly increasing the number of days it billed at the Ultra High and Very High RUG levels, thus artificially and fraudulently inflating the reimbursement they received from Government Programs.

7.      Because Defendants knowingly submitted false claims to Government Programs for medically unreasonable, unnecessary and unskilled therapy services, and used false records and statements to support these false claims, Relators bring this action on behalf of the United States and the *Qui Tam* States to recover treble damages and civil penalties under the FCA and State *qui tam* statutes.

## II.      JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345. The Court has original jurisdiction of the State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State laws for the recovery of funds paid by the *Qui Tam* States, and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.C. § 3730.

9.      This Court has personal jurisdiction over Defendants because, among other things, Defendants transact business in this District and engaged and continue to engage in wrongdoing in this District.

10.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). Defendants transact business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

11.     The causes of action alleged herein are timely brought because, among other things, of efforts by the Defendants to conceal from the United States, the *Qui Tam* States, patients, and the general public their wrongdoing in connection with the allegations made herein.

12.     Defendants' conduct had a material effect on government-funded health plans' decisions to pay for skilled therapy services performed by Defendants.  Had the United States known that Defendants misrepresented the schemes described herein, government-funded health plans would not have paid or made reimbursements for these skilled therapy services.

13.     Defendants' fraudulent scheme is ongoing.

## III.     PARTIES

### A.     PLAINTIFFS/RELATORS

14.     Relator Jacqueline Burdett is a resident of Tennessee.  In 2000, Relator Burdett first began working as a Certified Nurse Aide ("CNA") at the Westmoreland Care and Rehab Center ("Westmoreland"), which is located at 52 Austin Peay Highway in Westmoreland Tennessee, 37186.  At the time of Burdett's initial employment, Westmoreland was operated by Home Quality Management, Inc. ("HQM"), which was based out of Florida.  In 2007, HQM was purchased by Defendants, which became the owner and operator of the Westmoreland skilled nursing facility ("SNF") in addition to dozens of similar facilities nationwide.  In 2004, Relator Burdett was promoted to the position of Medical Records Director, a capacity in which she worked until November 21, 2014.  As Medical Records Director, her responsibilities included oversight of both medical audits and patient chart reviews.

15.     Relator Steve Appleton is a resident of Tennessee.  Relator Appleton is a Licensed Physical Therapy Assistant ("PTA") who was originally employed at the Westmoreland, Tennessee facility beginning in December 2001.  Relator Appleton was still working at the facility when Defendants took over management from HQM in 2007.  After the

takeover, Relator Appleton observed a change in skilled therapy priorities, including Defendants' decision to change the focus from patient care to maximizing billing of Government Programs for skilled therapy.

16.     Relators have direct knowledge of the conduct alleged in this Complaint and conducted an independent investigation to uncover false claims submitted to the United States and the *Qui Tam* States.  Accordingly, Relators are an "original source" of the non-public information alleged in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B), and these allegations are not based upon publicly-disclosed information.

17.     Prior to the filing of this Complaint, Relators provided the Government with written disclosure of substantially all material evidence and information that Relators possessed, in accordance with 31 U.S.C. § 3730(b)(2).

### B.     DEFENDANTS

#### 1.     Signature HealthCARE LLC

18.     Signature HealthCARE LLC ("Signature") is a privately held long-term health care and rehabilitation company with 126 locations in 10 states (Alabama, Florida, Georgia, Indiana, Kentucky, Maryland, North Carolina, Ohio, Tennessee, and Virginia).  Signature was founded in 2007 through a partnership between Joseph Steier, the current CEO and President of Signature, and Defendant ARBA Group.

19.     Signature is in the business of providing various long-term care services, including but not limited to skilled therapies, home health and hospice care.  Signature currently employs around 19,000 employees and is headquartered at 12201 Bluegrass Parkway in Louisville, Kentucky 40299.  Signature operates multiple related entities, including Signature Hometown, Signature Urban, ExceleratedCARE, Signature Rehab, Signature Acute, and

Signature HomeNow, which provide services ranging from critical access hospitals to home care services.

20.     In 2011 Signature's annual revenue was $695 million, which at the time represented a 38% three-year growth rate.  In April 2014, CEO Steier described Signature as being "about a billion dollar company."

### 2.     ARBA Group, Inc.

21.     Defendant ARBA Group, Inc. ("ARBA") is a privately-held real estate management company headquartered at 6380 Wilshire Blvd, Suite 200 in Los Angeles, California 90048.  ARBA helped with the creation of Defendant Signature through a partnership with current Signature CEO Joseph Steier.

22.     ARBA has a staff of between 20 and 49 employees with average annual revenue of $10-20 million.

### 3.     Health Care REIT, Inc.

23.     Defendant Health Care REIT, Inc. (NYSE: HCN) is a real estate investment trust focused on senior living and health care real estate with 1,246 properties in 46 states, the United Kingdom, and Canada. These properties include senior living communities, medical office buildings, inpatient and outpatient medical centers and life science facilities.

24.     Health Care REIT was founded in 1970 and is headquartered at 4500 Dorr Street in Toledo, Ohio 43615. It bills itself as a 'single-source solution for acquiring, planning, developing, managing, repositioning, and monetizing real estate assets' and is viewed as a trusted capital partner by many senior housing operators. Health Care REIT employs between 201 and 500 employees and boasts a portfolio value of $20 billion.

25.     Health Care REIT's portfolio currently includes 31 of the 126 total Signature facilities representing a significant proportion of Signature's properties. Health Care REIT does

not list Signature as a partner on their website, but does include "Signature Healthcare" as a partner in several of their corporate documents, including annual reports.

### 4.    John Does #1-50 Fictitious Names

26.    Defendants John Does #1-50, fictitious names, are individuals, corporations, limited liability companies, or other lawful business entities that, through Defendants, do business in the United States, and who are unknown co-conspirators who conspired with Defendants to perpetuate the fraudulent scheme as described herein.  To the extent that any of the conduct or activities described in this Complaint were not performed by Defendants, but by the individuals described herein as John Does #1-50, fictitious names, any reference herein to Defendants under such circumstances, and only under such circumstances, refers also to John Does #1-50 and/or other co-conspirators who conspired with Defendants to perpetrate the schemes described herein.

## IV.    REGULATORY BACKGROUND

### A.    THE MEDICARE PROGRAM

27.    The Medicare Program ("Medicare") is the federal health insurance program for the aged and disabled established by Congress in 1965 as Title XVIII of the Social Security Act and codified at 42 U.S.C. § 1395, *et seq*.  Medicare is administered through the Centers for Medicare and Medicaid Services ("CMS"), formerly the Health Care Financing Administration ("HCFA").  CMS is a division of the United States Department of Health and Human Services ("HHS").  Defendants were and are approved providers and/or suppliers under the Medicare Program.

28.    Medicare reimburses health care providers for specified health care services furnished to certain population groups, including the disabled and persons over 65.  Persons eligible for Medicare reimbursed services are referred to as "beneficiaries."  Currently, Medicare

provides insurance coverage for over 40 million Americans, including many who require skilled therapy services.

29.     The Medicare Program is divided into three parts:  (a) hospital insurance (also known as "Part A"); (b) supplementary medical insurance (also known as "Part B"), which pays for covered services rendered to beneficiaries in SNFs under both Part A and Part B of the Program; and (c) Part C of the Medicare Program, or "Medicare + Choice," which provides new health care options in addition to basic Medicare benefits.  *See* 42 U.S.C. §§ 1395 through 1395i-5 (Part A – Hospital Insurance Benefits for the Aged and Disabled); *see also* 42 U.S.C. §§ 1395j through 1395w-4 (Part B – Supplemental Medical Insurance Benefits for the Aged and Disabled); 42 U.S.C. § 1395w-21 (Medicare + Choice Plan).

### 1.     Medicare Part A

30.     Medicare Part A is so called because the governing law is found in Part A of Title XVIII of the Social Security Act.  Some of the services that are covered under Part A include, without limitation:  (a) part-time or intermittent skilled nursing care and home health aid services; (b) physical, speech and occupational therapy; (c) medical equipment and supplies; and (d) social services.  *See* 42 U.S.C. §§ 1395 through 1395i-5 (Part A – Hospital Insurance Benefits for the Aged and Disabled).  TRICARE pays nursing facilities using the same system as Medicare.  TRICARE Reimbursement Manual 6010.58M, Ch. 8, § 2,4.3.5 - 4.3.7, 4.4.3.

31.     In order to receive coverage under Part A for SNF care, beneficiaries must continue to meet regular eligibility requirements.  That is, a beneficiary must have been an inpatient of a hospital for a medically necessary stay of at least three (3) consecutive calendar days.  In addition, within thirty (30) days after discharge from a hospital, the beneficiary must have been transferred to a SNF that signed a participating agreement with CMS.  Further, the

beneficiary must require daily skilled nursing or rehabilitation services. 42 U.S.C. § 1395x(i); HCFA Skilled Nursing Facility Manual, Chapter 2 – Coverage of Services, § 212, *et seq*.

32.     Medicare requires that a physician or other health care provider certify that the conditions affording coverage are met at the time of the patient's admission to the nursing facility or rehab program and to recertify the patient's continued need for skilled therapy services at regular intervals. To be considered a "skilled service," it must be so "inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical, occupational or speech therapists. 42 C.F.R. § 409.31(a).

33.     Skilled rehabilitation therapy does not generally include personal care services or assistance with acts of daily living, or other general exercises or range of motion treatments that can be administered by non-skilled staff, including exercises to improve gait, maintain strength or provide assistance with ambulation. *See* 42 C.F.R. § 409.33(d); *see also* Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1

34.     If a beneficiary meets these eligibility requirements, then Medicare provides one hundred (100) days of Part A SNF coverage per benefit period. 42 U.S.C. § 1395(a)(2).

**2.     Medicare Part B**

35.     Medicare Part B provides supplemental medical insurance and only provides for payment of those services that are medically necessary. *See* 42 C.F.R. § 410.3 (Scope of Benefits).

36.     Part B is a voluntary program financed in part through premiums paid by the participants. Each Part B participant must pay a basic monthly premium as well as any deductible or co-insurance amount. *See* CMS Carrier Manual, Part 3, Chapter I – Entitlement and Enrollment, § 208.

37.     Part B is also funded by the Federal Government.  There are two ways that the government makes payment under Part B of the Medicare Program:  (1) directly to the physician or facility – the assignment method or (2) directly to the patient who is obligated to reimburse the physician or facility.  *See* CMS Carrier, Manual, Part 3, Chapter III – Claims Filing Jurisdiction and Development Procedures.

### 3.     Medicare Reimbursement and SNFs

38.     Section 4432(a) of the Balanced Budget Act ("BBA") of 1997 modified how payment was made by the government for skilled care services.  Effective with cost reporting periods beginning on or after July 1, 1998, SNFs transitioned to the Prospective Payment System ("PPS").  Under the PPS, SNFs received a fixed *per diem* rate for all Part A post-hospital extended care services.  As such, SNFs could no longer bill the government based on reasonable costs or through low volume, but rather based on prospectively determined rates for covered Part A SNF services provided to patients.

### (i)     Setting Payment Rates (using RUGs)

39.     The initial payment rates to SNFs and Rehab agencies set in 1998 reflected the projected amount that SNFs received in 1995, adjusted for inflation.  The base payment rates were computed separately for urban and rural areas and were updated annually based on the projected increase in the SNF market basket index, a measure of the national average price level for the goods and services SNFs purchase to provide care.

40.     Daily payments to SNFs are determined by adjusting the base payment rates for geographic differences in labor costs and case mix.  To adjust for labor cost differences, the labor-related portion of the total daily rate—seventy-six percent (76%) for fiscal year 2007—is multiplied by the hospital wage index in the SNF's location and the result is added to the non-labor portion.

41.     Medicare requires nursing facilities periodically to assess each patient's clinical condition, functional status, and expected and actual use of services, and to report the results of those assessments using a standardized tool known as the Minimum Data Set ("MDS"). The MDS is used as the basis for determining a patient's RUG level and, therefore, the daily rate that Medicare will pay a nursing facility to provide skilled nursing and therapy to that patient.

42.     In general, a nursing facility must assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's Medicare Part A stay in the facility. The date the facility performs the assessment is known as the assessment reference date. A nursing facility may perform the assessment within a window of time before this date, or, under 10 certain circumstances, up to five days after. When a nursing facility performs its assessment (except for the first assessment), it looks at the patient for the seven days preceding the assessment reference date. As discussed above, this seven day assessment period is referred to as the "look-back period."

43.     The MDS collects clinical information on over a dozen criteria, including hearing, speech, and vision; cognitive patterns; health conditions; and nutritional and dental status. Section P of the MDS ("Special Treatments and Procedures") collects information on how much and what kind of skilled rehabilitation therapy the facility provided to a patient during the look-back period. In particular, Section P shows how many days and minutes of therapy a nursing facility provided to a patient in each therapy discipline (i.e., physical therapy, occupational therapy, and speech-language pathology and audiology services). As discussed below, the information contained in Section P directly impacts the rehabilitation RUG level to which a patient will be assigned.

44. Prior to October 1, 2010, the nursing facility would electronically transmit the MDS form to a state's health department or other appropriate agency, which in turn would transmit the data to CMS. 42 C.F.R. § 483.20(f)(3) (2008); 42 C.F.R. § 483.315(h)(1)(v) (2008). Since October 1, 2010, nursing facilities transmit the data directly to CMS. 42 C.F.R. § 483.20(f)(3).

45. CMS makes use of the RUG classifications to determine the *per diem* reimbursement for patients. RUGs determine how much Medicare pays SNFs. The daily base rates are adjusted for case mix. Each RUG has associated nursing and therapy weights that are applied to the base payment rates. These weights were developed using time study data from 1990, 1995 and 1997. These weights have been updated since the implementation of PPS.

46. The fifty-three (53) group RUG classification system went into effect January 1, 2006, replacing the forty-four (44) group RUG system. The 53-group system added nine new payment groups for patients who meet the criteria for "extensive services" and "rehabilitation" groups. Patients are assigned to one of the 53 RUGs based on patient characteristics and service use that are expected to require similar resources.

47. Assigning a Medicare beneficiary to one of the RUGs is based on the number of therapy (physical, occupational, or speech) minutes that the patient has used or is expected to use; the need for certain services (e.g., respiratory therapy or specialized feeding); the presence of certain conditions (e.g., pneumonia or dehydration); an index based on the patient's ability to perform independently four activities of daily living (e.g., eating, toileting, bed mobility and transferring); and in some cases, signs of depression. Patients' characteristics and service use are determined by periodic assessments using the MDS. The highest daily rate Medicare will pay a nursing facility is reserved for those beneficiaries that require "Ultra High" levels of skilled

therapy, or a minimum of 720 minutes per week of skilled therapy from at least two therapy disciplines.

48.     There are five basic RUG classifications delineated by the amount of time a patient is required to be in therapy in order to achieve the expected therapeutic result.  The classifications are:  Ultra High (over 720 minutes), Very High (500-719 minutes), High (325-499 minutes), Medium (150-324 minutes) and Low (45-149 minutes).  The Ultra High level is intended for the most clinically complex patients who require skilled therapy services well beyond the average patient.

49.     CMS made various changes to the RUG-III structure through its RUG IV classification system, which took effect October 1, 2010.  CMS initiated a national project to create an updated MDS (Version 3.0) to improve the clinical relevance and accuracy of MDS assessments.  CMS added new clinical RUG categories, modified the time frame in which each assessment must be performed, required that facilities assess changes in the level of therapy every seven days and revised certain rules to group therapy, among other changes.  74 Fed. Reg. 40,288 (August 11, 2009).  Under the revised regulations, CMS changed the rules for concurrent therapy by apportioning payment among patients treated concurrently and by counting as "treatment" minutes only the apportioned therapist time rather than the actual number of therapy minutes provided to patients.  By apportioning minutes and not counting the actual number of therapy minutes administered to a patient in concurrent sessions, patients should be assigned to lower RUG categories with lower payment levels.  Further, facilities must complete a "change of therapy" assessment when the amount of therapy provided no longer reflects the RUG and an "end of therapy" assessment must be completed when therapy has been discontinued for three consecutive days.

50.     The structure of the RUG groups and daily PPS rate is adjusted periodically.  The RUG-III classification was in place from January 1, 2006 through October 1, 2010.  The RUG-IV classification system has been in effect from October 1, 2010 through the present.  70 Fed. Reg. 45026-01.

51.     There are seven RUG-III categories:  rehabilitation, extensive services, special services, clinically complex, impaired cognition, behavior and physical.  63 Fed. Reg. 26252-01. The rehabilitation category is divided into five sub levels determined by the amount of time a patient is required to be in therapy in order to achieve the expected therapeutic result.  Ultra High or Rehab Ultra, requires 720 minutes of therapy per week, with two out of three therapy disciplines and one discipline providing services 5 days a week,  Rehab Very High requires 500 or more minutes of treatment per week and one discipline providing services 5 days  a week or more, Rehab High requires 325 minutes or more of treatment a week with one discipline providing services 5 days a week or more, Rehab Medium requires 150 minutes of treatment from any of the 3 disciplines at least 3 days a week and Rehab Low requires 45 minutes of treatment a week from any of the 3 disciplines for at least 3 days of the week.  The Ultra High level is intended for the most clinically complex patients who require skilled therapy services well beyond the average patient.  *Id*.

52.     RUG levels also consider a patient's capacity to perform activities of daily living ("ADL") such as toileting, eating, transfers and mobility.  ADL scores are broken into 5 different scores based on a person's capabilities ranging from categories A, B and C, which involve rehabilitation that do not involve extensive services, to categories L and X, which involve extensive services.  Using this scoring, the patient in need of the lowest level of services would

score an A, while the patient in need of the most extensive services would score an X. 74 Fed. Reg. 40288-01.

53.　　The MDS form is required to be completed and submitted to the Government for all nursing home residents who receive reimbursement from Medicare or Medicaid. 42 C.F.R. § 483.315. SNFs use the MDS to assess each beneficiary's clinical condition, functional status, expected and actual use of services. In the MDS, a health care provider must provide the Government with an accurate and comprehensive assessment of each resident's functional capabilities, identify health care problems and formulate a resident's individual plan of care. MDS assessments are required to be completed by nursing homes for all residents and generally such forms are completed within 5 days of admission, 14 days thereafter and then at 30, 60 and 90 day intervals.

54.　　MDS assessments are signed by the individuals who complete all or a portion of the MDS form and contain the following certification:

> I certify that the accompanying information accurately reflects resident assessment or tracking information for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information and that I may be personally subject to and may subject my organization to substantial criminal, civil and/or administrative penalties for submitting false information. I also certify that I am authorized to submit this information by this facility or on its behalf.

55.　　MDS assessments are transmitted electronically by nursing homes to the MDS database in their respective states, which information is then captured into a national MDS data base at CMS.

56.     Specifically, a patient's RUG information is incorporated into the Health Insurance Prospective Payment System (HIPPS) code, which Medicare uses to determine the payment amount owed to the nursing facility.  The HIPPS code must be included in the CMS-1450, which nursing facilities submit electronically to Medicare for payment.  Medicare Claims Processing Manual, Ch. 25, § 75.5.  Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of the CMS-1450.  *See* 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, § 75.5

57.     Skilled nursing facilities submit the CMS-1450 electronically under Medicare Part A to Medicare payment processors, known as Medicare Administrative Contractors ("MACs"), formerly known as Fiscal Intermediaries ("FIs").  MACs process and pay Medicare claims.

(ii)     <u>Medicare Overpayments to Facilities</u>

58.     Providers may not submit claims for services that are "of a quality which fails to meet professionally recognized standards of health care."  42 U.S.C. § 1320c-5(a)(2) (providers may not submit claims for inadequate care); 42 U.S.C. § 1320a-7b(a)(1) and (3) (criminal penalties for submitting false claims when a provider knows it has no continued right to receive payment).  Clinical practice requirements dictate that SNFs accurately document the number of therapy minutes provided to each beneficiary.  CMS RAI Manual 2.0, § 1.14.  In addition, providers must document in the medical record the care each beneficiary needs and receives, as well has how he or she responded to that therapy.  *Id*.

59.     The Federal Government and the states share the cost of servicing Medicaid beneficiaries.  The specific percentage that the Federal Government reimburses a state is referred to as the Federal Medical Assistance Percentage ("FMAP") and is calculated for each state according to a formula based on per capita income.  Pursuant to the express language of the FCA

and its statutory definition of a "claim," Medicaid claims submitted to state Medicaid agencies are considered to be claims presented to the Federal Government, and as such, may give rise to liability under the FCA.  *See United States ex rel. Tyson v. Amerigroup Illinois, Inc*., 2005 U.S. Dist. LEXIS 24032, 2005 WL 2667202 at *3 (N.D. Ill. 2005); *U.S. V. Ortho-McNeil Pharmaceutical, Inc*., 2007 U.S. Dist. LEXIS 52666, 2007 WL 2091185 at *2 (N.D. Ill. 2007).

60.   When an incorrect payment is made to a SNF or Rehabilitation agency, it is responsible for the payment unless the intermediary determines that it was without fault.

61.   Under the following situations, providers are liable for any overpayment:  (a) when a SNF furnished erroneous information or failed to disclose facts it knew or should have known were relevant to payment of a benefit; (b) the overpayment was due to a mathematical or clerical error, e.g., an error in calculation by the SNF, or overlapping or duplicate bills; (c) documentation was not submitted to substantiate that the services billed to Medicare were actually performed; or (d) Medicare paid for services not covered under the program and the SNF should have known the services were not covered (e.g. medically unnecessary services).

(iii)   Medicare Coverage for Reasonable and Necessary Services

62.   Coverage of health care services under Medicare is subject to the requirement that the services provided are reasonable and necessary for the treatment of an illness or injury or to improve the functioning of a malformed body part.  Health care services that fail to meet this requirement will not be reimbursed by the Government.  *See* 42 U.S.C. § 1862 (a)(1)(A).

63.   A specific health care service is *necessary* when it can be expected to make a meaningful contribution to the treatment of a patient's illness or injury.

64.   Though the health care service may serve a medically necessary purpose, a Rehab agency must also consider to what extent, if any, it would be *reasonable* for the Medicare Program to pay for the item prescribed, taking into account the following considerations:

(a)     Would the expense of the item to the program be clearly disproportionate to the therapeutic benefits that could ordinarily be derived from use of the equipment?

(b)     Is the item substantially more costly than a medically appropriate and realistically feasible alternative pattern of care?

(c)     Does the item serve essentially the same purpose as equipment already available to the beneficiary?

(d)     Could those same services be provided as part of routine nursing care, including restorative care or wound care?

(iv)     <u>Cost Reports</u>

65.     All Medicare Part A participating providers are required to file cost reports each year with their fiscal intermediary.  The cost report serves as the health care provider's final claim for payment from Medicare for the services rendered to program beneficiaries for the fiscal period in question.  The cost report sets forth all of the provider's costs, accounts for the costs under applicable provisions of the Medicare statue and HHS program instructions, and results in a claim for a total amount of reimbursement for the fiscal year.  *See* 42 C.F.R. §§ 413.20, 413.24.

66.     In the cost report, providers must document the costs incurred in furnishing items and services to Medicare beneficiaries, such as costs arising from arrangements with outside suppliers to obtain items and services, including medical equipment and supplies.  *See* 42 U.S.C. § 1395g(a); 42 U.S.C. § 413.20(b).

67.     The cost report form requires a Rehab agency or related entity providing skilled therapy services to certify that he/she is "familiar with the laws and regulations regarding the provision of health care services and that the services identified in the cost report were provided in compliance with such law and regulations."  *See* 42 U.S.C. § 1395g(a); *see also* 42 C.F.R. § 413.24(f).

68.     Misrepresentation or falsification of any information contained in a cost report is punishable by civil, as well as criminal and administrative action, fine and/or imprisonment under federal law.  Further, if services identified in a cost report were provided or procured through the payment directly or indirectly of an illegal kickback or referral, then civil, criminal and administrative action, fine and/or imprisonment may result.  *See* 42 U.S.C. § 1395g (a); *see also*, 42 C.F.R. § 413.24(f).

**B.     TRICARE**

69.     TRICARE (formerly CHAMPUS) is a federally funded medical benefit program established by statute.  10 U.S.C. §§ 1071-1110.  TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.

70.     TRICARE covers the same skilled nursing services as Medicare.  The regulatory authority implementing the TRICARE program provides reimbursement to health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies.  10 U.S.C. §§ 1079(j)(2) (institutional providers).

71.     TRICARE, like Medicare, pays only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury."  32 C.F.R. § 199.4(a)(1)(i).

72.     TRICARE follows Medicare's PPS and RUGs methodology and assessment schedule, and beneficiaries are assessed using the same MDS form used by Medicare.  TRICARE Reimbursement Manual 6010.58M, Ch. 8, § 2, 4.3.5 – 4.3.7, 4.4.3.

73.     Under the TRICARE for Life program, there are beneficiaries who are enrolled in Medicare and are still eligible for TRICARE ("dual eligible beneficiaries").  For these dual eligible beneficiaries, TRICARE is the secondary payor to Medicare and is responsible to the skilled nursing facility for any amounts not covered by Medicare.  *Id*. at 4.4.

74.     TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records.  32 C.F.R. §§ 199.9(b)(3)-(b)(5).  TRICARE considers "[b]illings or CHAMPUS claims which involve flagrant and persistent overutilization of services without proper regard for results, the patient's ailments, condition, medical needs, or the physician's orders" to be fraud.  32 C.F.R. § 199.9(c)(3).  Such practices are deemed abusive and cause financial loss to the United States.  32 C.F.R. § 199.9(b).

75.     For TRICARE dual eligible beneficiaries, TRICARE follows Medicare's determination regarding medical necessity.  If services are determined not to be medically necessary under Medicare, they are not covered under TRICARE.  TRICARE Reimbursement Manual 6010.58M, Ch. 8, § 2, 4.3.16 (Note).

### C.     MEDICAID

76.     Nursing facility services are provided by Medicaid certified nursing homes, which primarily provide three types of services: Skilled nursing or medical care and related services; Rehabilitation needed due to injury, disability, or illness; Long term care—health-related care and services (above the level of room and board) not available in the community, needed regularly due to a mental or physical condition. A nursing facility is one of many settings for long term care, including other services and supports outside of an institution, provided by Medicaid or other state agencies.

77.     Medicaid coverage of nursing facility services is available only for services provided in a nursing home licensed and certified by the state survey agency as a Medicaid Nursing Facility (NF). Medicaid Nursing Facility Services are available only when other payment options are unavailable and the individual is eligible for the Medicaid program.

78. A NF participating in Medicaid must provide, or arrange for, nursing or related services and specialized rehabilitative services to attain or maintain the highest practicable physical, mental, and psychosocial well being of each resident.

79. There is no exhaustive list of services a NF must provide, in that unique resident needs may require particular care or services in order to reach the highest practicable level of well being. The services needed to attain this level of well-being are established in the individual's plan of care.

80. Specific to each state, the general or usual responsibilities of the NF are shaped by the definition of NF service in the state's Medicaid State plan, which may also specify certain types of limitations to each service. States may also devise levels of service or payment methodologies by acuity or specialization of the nursing facilities.

## V. DEFENDANTS' FRAUDULENT SCHEME

81. While employed by Defendants, Relators observed multiple practices designed to fraudulently overcharge Government Programs, including Medicare, Medicaid and TRICARE, for skilled therapy services, as more fully described below, including, but not limited to the following:

    a.    Fraudulent and improper up-coding of RUG levels for Medicare and TRICARE patients to increase the billable rate of skilled therapies for patients who did not qualify for therapy or who did not meet the higher RUG levels based on their actual therapy needs;

    b.    Providing skilled therapy to those who did not meet eligibility or reimbursement criteria for skilled care;

    c.    For patients who may have initially been eligible for skilled therapy, extending a patient's length of stay beyond their therapeutic needs to capture as much of Medicare's 100-day reimbursement allowance as possible, irrespective of whether patients were making actual progress in therapy;

d.    Billing Medicare and other Government Programs for minutes that did not involve actual skilled therapy, which included minutes spent on documentation and transporting patients to and from therapy sessions;

e.    Providing skilled therapy to patients who were terminal or at end of life. Many such patients were not only ineligible to receive care, but suffered needlessly because of Defendants' systematic scheme of forcing skilled therapy on any Government Program beneficiary because of the revenue generating opportunity that such patients presented. While some patients in Defendants' SNFs were terminal and could benefit from hospice care, Defendants intentionally discouraged the use of hospice care in many of their facilities because Medicare will not cover skilled therapy billing for hospice patients;

f.    Billing Medicare for routine, non-skilled care—like range-of-motion exercises—to artificially inflate skilled therapy minutes to maximize reimbursement for Ultra High and Very High RUG levels. Many of Defendants' facilities had insufficient CNA staffing to provide active range-of-motion therapy to residents who required this non-skilled care, which in turn was provided by physical and/or occupational therapists;

g.    Providing medically unnecessary skilled therapy to long-term care demented patients; and

h.    Providing excessive and unnecessary skilled therapy to Medicare Part B patients, who did not meet reimbursement criteria for skilled therapy or qualify for extensions.

82.    Because Medicare reimburses significantly more money for beneficiaries receiving therapy in the Ultra High and Very High RUG categories than for beneficiaries at lower RUG levels, Defendants aggressively pushed its facilities and therapists to get as many of its Medicare beneficiaries as possible into the Ultra High and Very High RUG levels. Defendants accomplished this by setting and enforcing aggressive targets for the percentage of Medicare rehabilitation days its facilities had to bill at the Ultra High and Very High RUG levels, with little regard to the individualized needs of its Medicare patients. Defendants enforced these Ultra High targets at every level of its corporate hierarchy.

83.     Consequently, most Government Program beneficiaries treated by Defendants were placed in the Ultra High or Very High RUG classifications even though their true classifications, based on their actual medical needs, were in a lower tier. Alternatively, Medicaid beneficiaries received significantly less or no skilled therapy.

84.     Defendants forced their management staff and therapists to meet aggressively high targets that, in many instances, were wholly unrelated to the beneficiaries' actual condition or diagnosis.  Defendants' management staff, including their Administrators and Rehab Managers, received bonuses based on their ability to meet corporate revenue targets, which were driven in large part by the up-coding of RUG levels.

85.     For example, upon admission to the Westmoreland facility, most patients were automatically assigned physical and occupational therapy.  The Medical Director, Olusemi O'Dunusi, would routinely sign evaluation and treatment orders and would rarely, if ever, challenge the therapy minutes pre-assigned by Defendants.  Most patients were picked up for both physical and occupational therapy and ultimately placed, without evaluation, in an Ultra High or Very High RUG category.

86.     To further its scheme to defraud Government Programs, Defendants imposed unreasonably high productivity requirements for their therapists and therapy assistants.  For example, after Signature took over the Westmoreland facility, it raised therapy productivity requirements for its therapy assistants to greater than 90 percent.  These excessive productivity requirements were implemented as yet another means to promote excessive and improper Medicare billing.  Given the typical eight-hour shift that therapists worked, such productivity levels encouraged and caused staff to inflate their minutes beyond the actual therapy time administered to patients.

87.     Defendants' fraudulent billing of up-coded RUGs was a corporate-wide practice taking place through out Defendants' many SNFs and Rehab facilities.  As Medical Records Director, Relator Burdett attended corporate meetings and was privy to various corporate documents, including documents that tracked RUG and billing data.  She also attended regular meetings at the Westmoreland facility in which the Administrator, Director of Nurses, Rehab Director, Business Manager and MDS coordinator would discuss skilled therapy, RUGs, lengths of stay and other related issues, including the number of remaining days for all Government Program beneficiaries.  In those meetings, which Defendants referred internally as "skilled meetings," management would emphasize that because Medicare was a major revenue generator, the treatment of Medicare patients was prioritized over Medicaid patients.  To that point, if the number of eligible Medicare Part A patients at a facility were to begin to decrease, Defendants immediately took measures to increase Medicare Part B utilization, including evaluating and identifying which patients were Part B eligible, in an effort not to lose revenue generated from Medicare reimbursements.

88.     In addition to the "skilled meetings" attended by Relator Burdett, Defendants also regularly convened Prospective Payment System ("PPS") meetings, which were attended by Westmoreland's facility Administrator (Connor McChurch), MDS Coordinator (Linda Robinson) and Rehab Manager (Peggy Tucker).  The agenda for these meetings would include reviewing RUG levels and minutes billed for the patient population.  The attendees would also discuss whether the facility was reaching the revenue-based "benchmarks" implemented by Defendants.

89.     To ensure that its employees carried out its unlawful scheme, Defendants devised a series of "benchmarks" that each facility was required to meet or exceed.  For example, the

corporate-wide benchmark established for Ultra High and Very High RUG levels exceeded 90%, which means that Defendants sought to (and did) place more than 90% of *all* therapy patients into Ultra High and Very High RUG categories, leaving less than 10% of all patients to be placed into the remaining Low, Medium and High RUG levels. Defendants developed these benchmarks not based on the actual therapy needs of the patients, but rather with a cynical focus on maximizing revenue obtained from Government Programs.

90. As the result of attending these meetings with senior management, Relator Burdett learned that these fraudulent billing practices were part of a corporate-wide scheme to overbill Medicare and TRICARE. Defendants carefully tracked the productivity of its therapists and kept tabs on the percentage of Government Program beneficiaries that were placed in the Ultra High and Very High RUG classifications.

91. Defendants' overbilling was facilitated and captured by a software program entitled Rehab Optima, which allowed Defendants' management to track precisely the amount of hours being expended on skilled therapy, as well as which patients were being placed in Ultra High and Very High RUG categories. As part of their corporate-wide practice, Defendants would also track the staff's unreasonably high productivity requirements through this program. The Rehab Optima program included a "hot sheet" that allowed Defendants' management to identify all patient minutes that were being "missed." Any such minutes would then be the responsibility of the particular therapist to bill before the end of the month, irrespective of whether such therapy was medically necessary for that patient. The program also allowed senior management to unilaterally adjust minutes upward for therapy services that were not actually provided, but rather helped the facility meet the benchmarks established by Defendants' senior management.

92.     Defendants then reinforced those targets via a host of methods, including through discussions at corporate meetings and presentations, regular emails from or visits by corporate personnel, employee performance evaluations, action plans imposed on underperforming facilities, and various other means.  While Defendants punished those facilities and employees that failed to meet its 90% Ultra High and Very High RUG benchmark and high productivity requirements, it rewarded and applauded those who met these targets.

93.     At the management level, Defendants created incentives to overbill Government Programs by providing additional compensation to administrators and higher level executives based on billing revenues generated by their individual SNFs and rehabilitation agencies. Specifically, Defendants paid department heads bonuses based on a formula that accounted for meeting (or exceeding) the established corporate-wide benchmarks (including RUG levels, billed minutes and productivity levels).  These bonuses were paid as a percentage of each facility's operating potential.  When taken together, these corporate practices subjected patients to medically unnecessary therapies and extended lengths of stay in a cynical effort to artificially inflate ("up-code") Medicare billings and maximize its profits.

94.     Therapists and their respective certified aides were pushed to meet the corporate targets of high minutes to reach the Ultra High and Very High RUG levels.  Those employees, including Relator Appleton, who failed to meet the targeted minutes for their patients, were asked to leave the facility before the end of their shifts.  As Relator Appleton was paid on an hourly basis, such corporate pressure provided an economic incentive to comply with the pre-assigned minutes or suffer a significant reduction in pay.

95.     As part of its goal to maximize Medicare and TRICARE payments, Defendants also frequently overrode or ignored the recommendations of its own therapists and unnecessarily delayed discharging beneficiaries from its facilities.

96.     As a direct result of Defendants' corporate pressure to maximize its Ultra High and Very High RUG billings, their therapists provided Medicare and TRICARE beneficiaries with excessive amounts of therapy that was not medically reasonable and necessary, and sometimes even harmful.  Moreover, instead of providing skilled rehabilitation therapy that was tailored to beneficiaries' particular needs, Defendants' therapists routinely provided generic, non-individualized services that did not (and could not) benefit the beneficiaries and that served primarily to inflate what Defendants billed Medicare and TRICARE for those beneficiaries.

97.     With most physical, occupational and speech therapy, one would expect the length of therapy sessions to decrease over time.  Either the patient improves, or if there is no improvement, therapy is discontinued.  But Defendants' corporate practice was to increase billing time during a reference period, irrespective of patient need.  Defendants also improperly and fraudulently extended lengths of stay for numerous skilled therapy patients, which caused increased and medically unnecessary expenditures by Government Programs

98.     Indeed, Defendants implemented a corporate-wide goal of extending the length of stay for Medicare patients as long as possible in an attempt to capture the full 100 days of reimbursable Medicare payments.  "Average length of stay" refers to the average number of days that a facility's beneficiaries stayed at the facility and, as described above, Medicare pays nursing facilities, per patient, per day.  Defendants pressured its facilities and therapists to extend Medicare beneficiaries' stays at Defendants' facilities in order to maximize revenue from Government Program reimbursements.   In fact, Defendants, at staff meetings addressing

discharge issues, discussed the corporate need to maximize the number of days a patient was kept at Defendants' facilities, even if the patient's condition plateaued or improved. These meetings and the corporate directives that flowed from such meetings ensured that Defendants maximized the length of stay for Medicare and/or TRICARE beneficiaries.

99.     This practice ignored patients' actual medical needs and sometimes resulted in beneficiaries unnecessarily exhausting all 100 days of their Medicare SNF benefit, leaving the beneficiaries with no Medicare Part A coverage for at least 60 days if the beneficiaries later actually needed skilled nursing or rehabilitation care. As with its Ultra High RUG targets, Defendants pushed its average length of stay targets on a corporate-wide basis.

100.     Defendants also fraudulently billed Medicare Part B for skilled therapy services. For example, when a patient's Medicare Part A benefits expired after 100 days, Defendants placed them back into other therapy sessions to make use of their available Medicare Part B benefits. As such, after exhausting the 100 days of reimbursable care under Medicare Part A, Defendants continued its fraudulent conduct by simply unlawfully billing Medicare Part B for unnecessary skilled therapy services.

101.     Relator Burdett observed that while there was more than sufficient staffing in Defendants' Rehab Unit, the rest of the nursing facility was frequently understaffed. Relator Burdett raised various concerns regarding patient neglect and ultimately left the facility because of those concerns. For example, she observed that patients were not being properly monitored for adverse effects resulting from the administration of psychotropic medications, including anti-psychotic medications. After the facility switched to an electronic records system, Defendants stopped monitoring and documenting the adverse side effects of such medications, contrary to Medicare regulations.

102.    Lack of adequate staffing and staff training also contributed to inadequate patient care plans and a significant numbers of patient falls.  In instances where a patient fell and sustained an injury, Defendants instructed staff to call the corporate office and consult with risk management attorneys before documenting the circumstances of the fall.

103.    Many elderly residents stay in Defendants' facilities on a short-term basis immediately following their discharge from hospitals in order to receive rehabilitation services covered by traditional Medicare Part A or Medicare HMOs.  Other residents stay on a long-term basis in Defendants' long-term care ("LTC") units with coverage provided under Medicare Part B.  Defendants engaged in a systematic and corporate-wide scheme to overcharge Medicare for the provision of skilled therapy to these particular patients.

104.    Therapists also were informed that they should bill *all* time spent with a patient, even if the therapists were providing non-skilled services, like transporting patients to a therapy session or the bathroom. Therapists and assistants who failed to meet their targeted corporate productivity goals or who failed to adhere to these corporate directives would suffer adverse employment consequences, including reprimands, and threats of termination.

105.    While working for Defendants, Relator Burdett encountered Patient A, who had been discharged from an acute care hospital and admitted to the Westmoreland facility in 2014 after having been diagnosed with end stage renal disease.  While at Westmoreland, Patient A was sent back to the hospital on a number of occasions for medical treatment and, upon each return to Defendants' facility, was subjected to intense and unnecessary skilled therapy.  As a result, Medicare Part A was fraudulently billed for these unnecessary skilled therapy services.

106.    Defendants regularly treated dying patients who would have been better served with hospice or palliative care, rather than aggressive physical and/or occupational therapy.  For

example, Relator Appleton participated in the treatment of Patient B, a Medicare beneficiary who was dying from terminal cancer. Of note, Patient B's foot had been partially amputated, making ambulation impractical. Patient B was aware of his terminal status and did not want to receive any form of skilled therapy, which was his right. However, consistent with Defendants' standard practice, his assigned therapists were instructed to convince him to participate. Therapy included having Patient B hop around on one foot, under the guise of leg strengthening. Patient B was treated on multiple days in September of 2014, including, but not limited to September 15, 16, 17, 18, 22, 23, 24, 25 and 26. Despite his terminal status and inability to make functional gains from skilled therapy, he was assigned to receive 60 minutes of treatment a day from both physical and occupational therapy disciplines. The pre-assigned therapy minutes were designed solely to place Patient B in the Very High and/or Ultra High RUG level in order to maximize Medicare reimbursements. Such treatment resulted in improper and fraudulent billing submissions under Medicare Part A.

107.     In 2014, Relator Appleton participated in the treatment of Patient C, a Medicare beneficiary who suffered from dementia. Despite Patient C's brain condition, he could ambulate without staff assistance and made multiple attempts to elope from the Westmoreland facility. The Rehab Manager pre-assigned therapy minutes to Patient C, including 60 minutes each of occupational and physical therapy. Patient C was also assigned to receive speech therapy, which he did not need. To capture additional, excessive minutes, Defendants also directed the staff to provide Patient C with non-skilled therapy, including walking him without assistance. When the staff escorted Patient C to the gym, they were instructed by Defendants to begin counting the minutes as soon as they arrived to his room. The therapy staff also was told by Defendants to bill for "therapy" outside of the facility, which included enabling Patient C to smoke cigarettes.

Defendants' conduct resulted in Patient C being improperly placed in the Ultra High RUG reimbursement category for purposes of fraudulently billing Medicare Part A.

108.    Relator Appleton was asked to treat Patient D on multiple days during 2014. Patient D had two prior admissions to the Westmoreland facility for a previous stroke. Having made limited functional gains during his prior stays, there was no realistic chance that Patient D would improve his functional status. Despite this fact, Patient D, a Medicare beneficiary, was assigned to receive physical, occupational and speech therapy for excessive periods of time so that Defendants could bill for therapy at the Ultra High or Very High RUG categories.

109.    Defendants fraudulently made use of Medicare Part B for patients who did not qualify for billing under Medicare Part A. When census in the Rehab Unit was low, Defendants would routinely pull long-term care patients into therapy and bill them under Medicare Part B. Patient E is one such example. In 2014, Patient E was picked up by both physical and occupational therapy disciplines at multiple times throughout the year. She was a long-term care patient who had no realistic chance of making functional gains, yet she was assigned to receive excessive amounts of both physical and occupational therapy. When Patient E left the facility to be hospitalized, she ultimately was readmitted at the Westmoreland facility and was placed back on Medicare Part A.

110.    Defendants prioritized the billing of skilled therapy over general patient care. While there were ample staff members assigned to provide skilled therapy, lack of adequate nurse aides and nursing staff assigned to provide general resident care contributed to patient neglect, which indirectly increased the cost of Medicare payments when such patients developed avoidable outcomes. Defendants often assigned only six nurse aides to provide care to some 100 patients. Patients were often not timely bathed or kept clean. In 2013, Westmoreland abolished

their restorative program and would have their therapists provide this non-skilled care to long-term care and other patients so such services could be improperly and fraudulently billed to Medicare.

111. Defendants' unlawful conduct also adversely impacted the skilled therapy that non-Medicare or non-TRICARE patients received. Specifically, these patients were given a lower priority because they were deemed by Defendants to provide less of a financial windfall than patients whose therapy was reimbursed by Government Programs. This resulted in many patients being treated not upon their actual needs, but upon whether their insurance fit within Defendants' scheme to fraudulently overbill Government Programs through the unlawful manipulation of RUG categories.

112. Defendants' corporate strategy of maximizing therapy minutes for terminal and dying Government Program beneficiaries also resulted in unnecessary pain, suffering and violations of patient dignity. Rather than promoting more compassionate treatment including hospice care, these patients were frequently steered or pushed into skilled therapy programs against their (or their families') wishes, in violation of both regulatory and community practice standards. The rigors of skilled therapy services wasted the patients' already limited time, often causing patients to become uncomfortable or exhausted.

113. Defendants filed claims for payment under the Medicare Program based on the illegal activities detailed above. Defendants and their staff, operating within the course and scope of their employment, falsely certified to their fiscal intermediary that they were in compliance with all state and federal laws and regulations in order to continue to obtain Medicare and Medicaid funding, even though they knew of, participated in, and assented to the illegal conduct and fraud.

114.    Defendants' conduct, as described above, was part of overall corporate-wide practice to increase billing reimbursements for all of their facilities, including SNFs and Rehab agencies that provided therapy and related services.  These corporate practices, including but not limited to the RUG up-coding, were endorsed, ratified and facilitated by upper level management and chief executives of Defendants.

115.    Defendants' fraudulent scheme resulted in the submission of claims for payment from Government Programs for therapy that was excessive in frequency, duration and intensity for Government Program beneficiaries who could not reasonably benefit from such treatments. These fraudulent activities are continuing as of the date this Complaint was filed and will likely continue into the future.

116.    Defendants' corporate strategy and pressure succeeded in significantly increasing the number of days it billed at the Ultra High and Very High RUG levels and therefore inflating the money it received from Medicare and TRICARE.

117.    Defendants' fraudulent scheme ultimately resulted in their receipt of payments from Government Programs to which they were not entitled.  From at least 2007 through 2015, Defendants submitted thousands of fraudulent claims and, in return, received millions of dollars in total reimbursement from Medicare and TRICARE for these fraudulent claims.

## VI.    DEFENDANTS CONSPIRED TO DEFRAUD GOVERNMENT PROGRAMS

118.    As alleged in this Complaint, the key facet of Defendants' scheme involved one or more plans with the facilities owned by Defendants to further the overall fraud through a pattern and practice of false and misleading claims for therapy services ("overt acts").

119.    Defendants entered into numerous agreements through which they agreed to conspire to perform the overt acts alleged herein.  The overt acts included the submission to Government Programs by Defendants' skilled nursing facilities of knowingly false certifications

that are conditions of Government Program participation and payment (which certifications were false at the time the certifications were made). As a result of these false certifications, Government Programs made payments to Defendants' skilled nursing facilities.

120. Defendants shared in the conspiratorial objective, and further agreed and intended to each perform and to each benefit from these unlawful overt acts in furtherance of the scheme to target and financially injure Government Programs. Accordingly, Defendants entered into these unlawful relationships for the purpose of their planned scheme to target Government Programs and submit or cause the submission of false or fraudulent claims and records.

121. As described in this Complaint, Defendants intentionally conspired to get a false or fraudulent claim allowed or paid by the United States; one or more of these conspirators performed one or more overt acts to effect the object of the conspiracy; and Government Programs suffered damages as a result of the false or fraudulent claims.

## VII.  DEFENDANTS KNOWINGLY VIOLATED THE FALSE CLAIMS ACT AND FALSELY CERTIFIED COMPLIANCE WITH FEDERAL REGULATIONS

122. Defendants' schemes, as described herein, subject Defendants to liability under the False Claims Act, 31 U.S.C. § 3729 as a direct result of the false claims submitted to Government Programs for services that were ineligible for reimbursement.

123. Defendants' unlawful conduct was material to reimbursement decisions made by Government Programs.

124. Defendants are responsible for evaluating relevant Medicare regulations.

125. In order to enroll in and bill Medicare, providers like Defendants must sign CMS Form 855, which states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. … I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations,

and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

126. The CMS application also contains an acknowledgement that Defendants were providing true, correct, and complete information to Medicare.

127. Defendants did not notify CMS that it was engaged in unlawful upcoding and other illegal practices after it began billing Medicare for services provided to Medicare beneficiaries.

128. Defendants have continued to bill Government Programs, including Medicare, and TRICARE, for services rendered to program beneficiaries from at least 2007 to the present.

129. Claims that were submitted to Government Programs as a result, in part or in whole, of Defendants' misrepresentations regarding its compliance with the agreement it entered into with CMS were therefore false within the meaning of the federal False Claims Act.

130. Government Programs paid reimbursements for those false claims, and as a result have incurred and continue to incur significant damages due to Defendants' illegal conduct.

131. By causing these claims that it knew were ineligible for reimbursement to be submitted to and paid for by Government Programs, Defendants also made, used, or caused to be made or used, false records or statements material to false or fraudulent claims.

132. Defendants engaged in this conduct knowingly and with the intent to cause the submission of false claims to Government Programs.

133. In connection with Defendants' unlawful scheme, Government Programs relied on false and fraudulent statements when they approved payment for skilled therapy services, and in the absence of these false and fraudulent statements, they would not have approved such payments.

134.     Government-funded health plans paid reimbursements for the resulting false claims, and as a result have incurred and continue to incur significant damages due to Defendants' fraudulent scheme.

135.     Accordingly, Defendants have, expressly and impliedly, falsely certified its compliance with these federal and state statutes and regulations.

136.     Defendants' certifications of compliance with applicable statutes and regulations were material to Government Programs' decisions to make reimbursements for Defendants' skilled therapy services. Had Government Programs known that Defendants' certifications of compliance with the law were false, they would not have made reimbursements for these services.

137.     Defendants' false certifications of compliance with the law constituted the making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, and they directly caused Government Programs to pay or reimburse for skilled therapy services that were not eligible for payment or reimbursement.

138.     Defendants knew that its certifications of compliance with the law were false, and that its false certifications would cause Government Programs to make payments for its services.

**COUNT I**
**(Violation of the Federal False Claims Act, 31 U.S.C. § 3729: Presenting or Causing to be Presented False Claims)**

139.     Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

140.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the

United States of America false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A).

141.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729: False Records)

142.    Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

143.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

144.    The United States, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing for diagnostic sleep services performed on patients enrolled in Federal Programs.

145.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT III
### (Violation of False Claims Act, 31 U.S.C. § 3729: Conspiracy)

146.    Relators incorporate herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

147.    As detailed above, Defendants knowingly conspired with the various health care professionals identified and described herein to commit acts in violation of 31 U.S.C.

Filed Under Seal

37

§§ 3729(a)(1) & (a)(2). Defendants and these health care professionals committed overt acts in furtherance of the conspiracy as described above.

148.    As a result of Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT IV
### (Violation of Florida False Claims Act)

149.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

150.    This is a civil action brought by Relator, on behalf of the State of Florida, against Defendants under the Florida False Claims Act, Fla. Stat. § 68.083(2).

151.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

152.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

153.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

154.    The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance plans funded by the State of Florida or its agencies.

155.    As a result of Defendants' actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

## COUNT V
### (Violation of Georgia False Medicaid Claims Act)

156.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

157.    This is a civil action brought by Relator, on behalf of the State of Georgia, against Defendants pursuant to the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.2(b).

158.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

159.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

160.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

161.    The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

162.    As a result of Defendants' actions, as set forth above, the State of Georgia and/or political subdivisions have been, and may continue to be, severely damaged.

## COUNT VI
## (Violation of Indiana False Claims and Whistleblower Protection Act)

163.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

164.    This is a civil action brought by Relator, on behalf of the State of Indiana, against Defendants under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

16.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to

be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

165.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

166.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

167.    The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

168.    As a result of Defendants' actions, as set forth above, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VII
### (Violation of Maryland False Health Claims Act)

169.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

170.    This is a civil action brought by Relator, on behalf of the State of Maryland, against Defendants under the Maryland False Health Claims Act of 2010, Md. Code Ann., Health-Gen. § 2-604.

171.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(1).

172.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(2).

173.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still me making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Maryland, or its political subdivisions, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(8).

174.    The State of Maryland, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

175. As a result of Defendants' actions, as set forth above, the State of Maryland and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII
### (Violation of North Carolina False Claims Act)

176. Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

177. This is a civil action brought by Relator, on behalf of the State of North Carolina, against Defendants under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

178. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

179. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

180. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

181.     The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

182.     As a result of Defendants' actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT IX
### (Violation of Tennessee Medicaid False Claims Act)

183.     Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

184.     This is a civil action brought by Relator, on behalf of the State of Tennessee, against Defendants under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b).

185.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program,, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

186.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the

Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

187.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

188.     The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of the Medicaid program.

189.     As a result of Defendants' actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT X
## (Violation of Texas Medicaid Fraud Prevention Act)

190.     Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

191.     This is a civil action brought by Relator, on behalf of the State of Texas against, Defendants under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.101(a).

192.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or

misrepresentations of material fact that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

193.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed — and may still be concealing or failing to disclose, or causing to be concealed or not disclosed — information that permitted Defendants to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

194.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

195.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for services or products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

196.    The State of Texas, or it political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims

and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

197.    As a result of Defendants' actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XI
### (Violation of Virginia Fraud Against Taxpayers Act)

198.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

199.    This is a civil action brought by Relator, on behalf of the Commonwealth of Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

200.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

201.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

202.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

203.    The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

204.    As a result of Defendants' actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

205.    WHEREFORE, Relators pray for judgment against Defendants as follows:

A.      That Defendants be ordered to cease and desist from submitting or causing to be submitted any more false claims, or further violating 31 U.S.C. § 3729 *et seq*.; FLA. STAT. ANN. § 68.081, *et seq*., GA. CODE ANN. § 49-4-168, *et seq*., IND. CODE ANN. § 5-11-5.5, *et seq*.; MD. CODE ANN., HEALTH-GEN. § 2-601 *et seq*.; N.C. GEN. STAT. § 1-605, *et seq*.; TENN. CODE ANN. § 71-5-181, *et seq*., TEX. HUM. RES. CODE § 36.001, *et seq*., and VA. CODE ANN. § 8.01-216.1, *et seq*.

B.      That judgment be entered in Relators' favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for

losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.     That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d); FLA. STAT. ANN. § 68.085 ; GA. CODE ANN. § 49-4-168.2(i); IND. CODE ANN. § 5-11-5.5-6 ; MD. CODE ANN., HEALTH-GEN. § 2-605; N.C. GEN. STAT. § 1-610; TENN. CODE ANN. § 71-5-183(d); TEX. HUM. RES. CODE § 36.110; and VA. CODE ANN. § 8.01-216.7.

D.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in FLA. STAT. ANN. § 68.082, plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by FLA. STAT. ANN. § 68.082, to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

E.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in GA. CODE ANN. § 49-4-168, plus a civil penalty of not less than fifteen (15) percent or more than twenty five (25)  percent of the proceeds per claim as provided by GA. CODE ANN. § 49-4-168.2, to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

F.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in IND. CODE ANN. § 5-11-5.5-2, plus a civil penalty of at least five thousand dollars ($5,000) as provided by IND. CODE ANN. § 5-11-5.5-2, to the extent such multiplied penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

G.      That judgment be entered in Relators' favor and against Defendants for restitution to the State of Maryland or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Md. Code Ann., Health-Gen. § 2-602(a), multiplied as provided for in Md. Code Ann~ Health-Gen. § 2-602(b)(l)(ii), plus a civil penalty of not more than ten thousand dollars ($10,000} for each false claim, pursuant to Md. Code Ann., Health-Gen. § 2-602(b)(l)(i), to the extent such penalties fairly compensate the State of Maryland or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

H.      That judgment be entered in Relators' favor and against Defendants for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.C. GEN. STAT. § 1-605, multiplied as provided for in N.C. GEN. STAT. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by N.C. GEN. STAT. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken

by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

I. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in TENN. CODE ANN. § 71-5-182, multiplied as provided for in TENN. CODE ANN. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) pursuant to TENN. CODE ANN. § 71-5-182(a)(l), to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in TEX. HUM. RES. CODE § 36.052(a)(l), multiplied as provided for in TEX. HUM. RES. CODE § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to TEX. HUM. RES. CODE § 36.052(a)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act committed that resulted in injury to an elderly or disabled person, and of not less than one thousand dollars ($1,000) or more than ten thousand dollars ($10,000) for each unlawful act committed that did not result in injury to an elderly or disabled person, pursuant to TEX. HUM. RES. CODE

§ 36.052(a)(3)(A) and (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

    K. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in VA. CODE ANN. § 8.01-216.3(A), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by VA. CODE ANN. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

    L. That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

    M. That judgment be granted for Relators against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relators in the prosecution of this suit; and

    N. That Relators be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relators demand a trial by jury of all issues so triable.


Dated: April 28, 2015

              _____
              Michael Hamilton
              TN BPR #010720
              PROVOST UMPHREY LAW FIRM, LLP
              4205 Hillsboro Pike, Suite 303
              Nashville, TN 37215

Filed Under Seal
52

(615) 297-1932
mhamilton@pulf.com
*Attorney for Plaintiff/Relator*

*Of Counsel*

W. Scott Simmer
Andrew M. Miller
SIMMER LAW GROUP PLLC
600 New Hampshire Avenue,
NW, Suite 10-A
Washington, DC 20037
Telephone: (202) 333-4562
Fax: (202) 337-1039

Jeffrey J. Downey
THE LAW OFFICE OF
JEFFREY J. DOWNEY, P.C.
1225 I Street, NW, Suite 600
Washington, D.C. 20005
Telephone: (202) 712-9120
Fax: (202) 789-1116

Filed Under Seal
53